# Wiggins v. Synthes (U.S.A.)

130

*Gustine J. Pelagatti Sr.*, for appellant.

*Elizabeth M. McKenna, Mary Ann Mullaney,* and *Craig G. Lord,* for appellee.

## OPINION

## PROCEDURAL HISTORY

PANEPINTO, *J.*, October 13, 2010—Defendant, Synthes (hereinafter referred to as appellant) filed an appeal from this court's order filed June 23, 2010, wherein this court denied appellant's post-trial motions in their entirety and granted appellees' motion for delay damages. This court then entered judgment in favor of appellees and against appellant in the amount of $2,109,339.32. This products liability action resulted from a lawsuit filed by appellee alleging that two cannulated screws manufactured by the appellant broke after implantation into appellee's right hip, causing him to suffer irreparable permanent injuries. This matter proceeded to trial pursuant to the malfunction theory of products liability whereby appellees were claiming that the surgical screws suffered from a manufacturing defect which appellees were unable to specifically identify due to the fact that the surgical screws were discarded during a subsequent surgical procedure on appellee. Therefore, pursuant to the malfunction theory of products liability, appellees did not

need to prove the existence of a specific defect but were proceeding on the theory that the product malfunctioned in the absence of abnormal use and reasonable secondary causes.

In November of 2005, appellee, Van Rooyen, was a 15 year old child with a four week history of right thigh pain. He was subsequently diagnosed with Slipped Capital Femoral Epiphysis ("SCFE"). "SCFE" is a hip disorder that affects children. This disorder exists when the upper end of the child's thigh bone slips at the growth plate. Appellee underwent emergency surgery at the Children's Hospital of Philadelphia on November 24, 2005. During the surgery two surgical screws manufactured by appellant were implanted by the CHOP surgeons into appellee's right femur. X-rays taken of appellee's right hip on December 8, 2005 and January 10, 2006 revealed the two surgically implanted screws to be intact and unbroken. However, after the appellee developed some complaints, X-rays were then taken on July 27, 2006, which revealed that a reslip had occurred producing a displacement and that the two surgically implanted screws had broken.

Unfortunately, during the surgery performed on appellee at Shriner's Hospital on February 7, 2007, the two broken surgical screws were removed from his right femur and were discarded by personnel of that hospital. Subsequently, on December 10, 2007, appellee had total hip replacement surgery for his right hip performed at CHOP.

In October 2007, appellee commenced suit against appellant asserting a claim of strict liability under the malfunction theory. A jury was selected on November 20,

2009 and the matter was tried before a jury on November 23 through November 30, 2009. On November 30, 2009, the jury returned with a verdict in favor of appellees in the amount of $2,000,000.00.

On December 10, 2009, appellants timely filed their post-trial motions. After a review of briefs submitted by counsel for the parties and oral argument which was heard by this court on April 22, 2010, this court entered an order on June 23, 2010 denying appellants' post-trial motions and entering judgment in favor of appellees in the amount of $2,109,339.32, which included the jury verdict of $2,000,000.00 plus delay damages in the amount of $109,339.32. On June 23, 2010, appellants timely filed their appeal to the Superior Court of this court's order of June 23, 2010. On July 29, 2010, this court entered an order pursuant to Pennsylvania Rule of Appellant Procedure 1925(b) requiring appellee to file a concise statement of matters complained of on appeal. On August 19, 2010, appellants timely filed their concise statement of matters complained of on appeal.

## ANALYSIS

On Appeal, appellant sets forth nine errors complained of on appeal, the first (7) seven of which center around the burden of proof necessary to proceed under the malfunction theory of manufacturing defect. These initial seven errors complained of on appeal, which are set forth below, will be analyzed together.

1. *The trial court erred in failing to grant the following, as detailed in Synthes' motion for post-trial relief and its briefing in support of that motion, all of which is*

*incorporated in full by reference*

a. Synthes' motion in limine seeking to exclude certain portions of the May 28, 2009, report of plaintiff's sole medical expert and to preclude testimony on those portions of that expert report;

b. Synthes' motion for a non-suit;

c. Synthes' request that the verdict sheet require the jury to find that the plaintiff had proved that the surgical screws were given only normal or anticipated use and that no reasonable secondary causes were responsible for their breakage.

*2. The trial court erred by failing to Grant Synthes' motion for post-trial relief, which included Synthes' request for judgment notwithstanding the verdict or, alternatively, new trial or remittitur.*

*3. The trial court erred by submitting plaintiff's claim under the "malfunction" theory of defect to the jury when plaintiff's evidence was insufficient as a matter of law to establish the four elements of his claim;*

a. That the surgical screws malfunctioned;

b. That the surgical screws were not subjected to abnormal use;

c. That there were no reasonable secondary causes for the alleged malfunction other than that the surgical screws were defective; and

d. That the alleged defect was a substantial factor in causing, or the factual cause of, harm to plaintiff.

*4. Because each element of plaintiff's claim under the "malfunction" theory of defect required the determination of issues beyond the knowledge of laypersons, the trial*

*court erred by submitting appellee's case to the jury without legally sufficient expert testimony to establish each element of appellee's claim, i.e.:*

a. That the surgical screws malfunctioned;

b. That the surgical screws were not subjected to abnormal use;

c. That there were no reasonable secondary causes for the alleged malfunction other than the surgical screws were defective; and

d. That the alleged defect was a substantial factor in causing, or the factual cause of, harm to plaintiff.

*5. The trial court erred by submitting plaintiff's case to the jury when plaintiff's sole medical expert failed to opine to the requisite degree of medical certainty on the following four elements of plaintiff's claim under the "malfunction" theory of defect:*

a. That the surgical screws malfunctioned;

b. That the surgical screws were not subjected to abnormal use;

c. That there were no reasonable secondary causes for the alleged malfunction other than the surgical screws were defective; and

d. That the alleged defect was a substantial factor in causing, or the factual cause of, harm to plaintiff.

*6. The trial court erred by submitting a verdict sheet that insufficiently stated the interrogatories to be resolved by the jury.*

*7. The trial court misdirected the jury and erred by failing to frame the jury interrogatories so as to direct the jury to determine whether plaintiff had proved two of the*

*key elements of his claim under the "malfunction" theory of defect: that the surgical screws were given only normal or anticipated use and that no reasonable secondary causes were responsible for their breakage.*

Prior to trial appellant filed a motion in limine to preclude certain portions of appellee's expert report. Appellant's motion argued that appellee's expert, Dr. Sheldon Simon's report, fell short of establishing the necessary elements of a malfunction theory. Specifically, appellant argued that Dr. Simon's report did not contain any opinion regarding whether or not the breakage of the screws took place during normal or anticipated use, or an opinion regarding the absence of reasonable secondary causes which could have been responsible for the screws breaking.

It was appellant's contention that in order to proceed on a malfunction theory, appellees would need expert testimony regarding both the absence of abnormal usage and the absence of reasonable secondary causes. It was this court's decision after a review of Dr. Sheldon Simon's report that the necessary elements of appellee's claim under the malfunction theory were indeed contained in Dr. Simon's report and thus denied appellant's motion to preclude testimony from Dr. Simon.

At trial, appellee's case in chief consisted of four witnesses: Appellee child, James Van Rooyen III, Appellee mother, Rhonda Wiggins, Dr. Robert Wolfe, (Economist) and Dr. Sheldon Simon (orthopedic surgeon). Dr. Simon testified that the purpose of the screws used in the instant matter was to hold the correct position of the hip until the bone heals and prevent a reslip. He further testified that the two screws used in appellee's hip were ineffective in that they had broken and failed to

do the job of holding two parts together until it healed. He inferred that the screws were defective because of the screw breakage and the non-union. Dr. Simon specifically testified that if a screw breaks before the non-union has time to heal, one must ask if the screw were defective. Dr. Simon testified that with the particular surgery performed on the minor appellee, it takes a time frame of up to six months to unite. There was testimony that the broken screws were discovered upon an x-ray taken in July of 2006 which was more than six months following the November 24, 2005 surgery. However, there was testimony both from appellee's expert as well as from minor appellee and appellee, Rhonda Wiggins, that the appellee had begun to experience pain and had complaints with his right hip within several months following the November 2005 surgery, leading to the possibility that the screws had already broken.

It was the appellant's contention that appellee's expert failed to establish that the alleged breakage of the screws was the factual cause of harm to the appellee. However, appellee's expert testified that when a reslip occurs, the screws pull out of the head of the bolt, but they do not break. In this case, both screws broke. Dr. Simon further testified that the screws broke before healing, thus they were ineffective in doing their job. He related this to a manufacturing weakness. Dr. Simon testified that the screws were not supposed to break and in his experience it was the screw had pulled out of the bolt rather than the bolt holding onto the thread of the screw and breaking. Dr. Simon further testified that in the area where the slip occurred, the thickness of the screw itself was thinner.

During trial and on appeal, appellant contends that Dr.

Simon's use of the word "ineffective" did not amount to the particular type of expert testimony that is needed to proceed under a malfunction theory. However, upon a review of the entirety of Dr. Simon's testimony, this court was confident that Dr. Simon was clear: "The purpose of the screws is to hold the two parts together until this thing heals and basically what we see in this particular case is those screws broke before that happened and was ineffectively doing its job which I can only relate to the fact that there in the manufacture of these screws that it was weak in that area and that is the only way I could consider it that way." (Simon dep. Tr. 11-13-09) (56:20).

Appellants' also contend that appellees' case failed to establish a prima facie case free of abnormal use and secondary causes. However, a review of testimony in this case established that the minor appellee in the months leading up to the screw breakage did not act in an abnormal fashion. The minor appellee testified that after his operation in November of 2005, he followed his doctor's instructions and didn't walk too much and was careful in moving his hip and did not play football or baseball with the boys. Appellee's parent, Rhonda Wiggins, also testifi ed that she observed her son continuously between the time of the surgery, up to and including the date of the trial, and that during that time he did not engage in any strenuous activities or exercises and did not engage in any type of abnormal use. In addition, Dr. Simon himself testified that the fact that appellee was walking up and down the stairs more frequently in the months following the surgery was irrelevant to any abnormal behavior. Clearly, the evidence established at trial was that there was an absence of abnormal use.

Regarding evidence as to the absence of secondary

causes, appellee's expert, Dr. Simon, clearly stated that in his testimony as a whole that these screws are designed to last until the bone mends. It was his expert testimony that they broke within the time period normally expected for the bone to heal. There was testimony during trial that the minor appellee began to experience pain in his right hip region several months after the November 2005 surgery. This clearly was within the normal six month period of time in which appellee's expert testified that the bone would normally heal. Although the x-ray was not taken until July of 2006, which was seven months following the ceremony, the testimony and evidence produced indicated that the minor appellee was experiencing right hip pain and symptoms well within the six month period of time. Clearly there was evidence submitted to the jury to find that there was an absence of either abnormal use by the minor appellee or secondary causes with the breakage of the screws.

Appellants also contend that this court erred by failing to place two additional questions on the jury verdict slip under the malfunction theory. Appellants contend that this court erred in not requiring the jury to find that the screws were given only normal or anticipated use and that no reasonable secondary causes were responsible for the breakage. However, it was this court's determination that question #1 on the jury verdict slip which asked the jury whether or not the screws manufactured by appellant were defective when they left the possession of the manufacturer itself was consistent with the law as read to the jury during the court's charge. During the court's charge, this court instructed the jury that in a products liability case, that three facts need to be proven, including that the product was given only its normal or anticipated use and

that there did not exist any reasonable secondary causes responsible for the harm. Clearly the evidence established at trial was that there was an absence of any abnormal use on the part of the minor appellee, and that there was an absence of any reasonable secondary causes responsible for the harm.

Interestingly, appellant's own expert reasoned that these screws must have broken subsequent to the initial six months following the surgery due to the fact that the x-rays taken in July of 2006 first revealed the breakage. It was appellant's expert's testimony that the minor child would have been in such serious pain that the screws would have had to have broken just prior to the July 2006 x-ray. However, appellant's expert was not able to explain how the child was able to withstand such severe pain from July of 2006 when the screws were discovered broken until February of 2007, which was when he finally had his total hip replacement surgery done. Clearly, the jury was able to resolve the conflict between appellees' and appellant's expert and resolved this conflict in favor of appellees. Therefore, it was this court's opinion that the jury carefully considered all of the evidence in this case and made a determination that the screws had malfunctioned in that they had broken before their normal life expectancy and that there did not exist any abnormal use or reasonable secondary causes responsible for the screw breakage.

Appellant's matters No. 8 and No. 9 complained of on appeal are as follows and will be discussed together.

8. *The trial court erred by failing to grant new trial or, alternatively, remittitur on the grounds of verdict excessiveness when the jury awarded $2 million to plaintiff although plaintiff introduced no expert evidence at trial to support any inference that plaintiff's physical limitations*

*or physical condition or pain and suffering after he had the total hip replacement in December 2007 was any different (i) than it would have been had he not suffered the reslip, or (ii) than it would have been had he not suffered the reslip and had the hip replacement that became inevitable as soon as his acute SCFE was diagnosed.*

*9. The trial court erred by failing to grant new trial or, alternatively, remittitur on the grounds of verdict excessiveness when the $2 million the jury awarded to plaintiff was an award for pain and suffering that was beyond all reasonable bounds.*

Appellant contends that the trial court erred by failing to grant a new trial,or in the alternative, remittitur on the grounds of verdict excessiveness when the court awarded $2 million to appellee. However, a review of the testimony at trial did not establish that the jury's verdict was excessive. The jury heard testimony from both the appellee, his mother and appellee's orthopedic expert that appellee still suffers from limping; has ongoing hip pain; has limited ability to walk for approximately 15 minutes to a half-hour; and, has inability to stand for long periods without pain. He is no longer able to play football, baseball, basketball and experiences depression. In addition, minor appellee himself testified that he limps because his right leg is now shorter than his left and that he is sad because the broken hip took away his teenage years. He testified that he misses playing baseball, basketball, football. He testified that he takes Tylenol for pain and that he missed one and one-half years of school. He also testified that he gets depressed and feels ashamed when his peers see him limp. He testified that he has trouble sleeping at nights. He testified that between January 10, 2006 and July 27, 2006 he was in pain. Even more importantly,

appellee's expert testified that appellee's limp and pain will be a recurring problem for the remainder of his life and that, as Dr. Simon testified, the minor appellee's future occupation will be confined to sedentary work as a safety measure. In addition, the evidence presented to the jury established over $500,000 in economic damages. It was this court's determination that the jury verdict of $2 million was not excessive in light of the economic and non-economic damages proven at trial.

## CONCLUSION

For all of the above reasons, the trial court's order of June 23, 2010 denying applicant's motion for post-trial relief should be affirmed.